# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IKHANA GROUP, LLC,<br><br>                                    Plaintiff,<br><br>     v.<br><br>VIKING AIR LIMITED,<br><br>                                    Defendant. | Case No. 23-cv-01306-BAS-DEB<br><br>**ORDER GRANTING COUNTER-CLAIMANT VIKING AIR, LIMITED'S MOTION FOR PRELIMINARY INJUNCTION (ECF No. 9)** |
| And Related Counterclaim | |

This action is a license and trademark dispute between an aircraft manufacturer and an aircraft services business. Viking Air Limited manufactures the DHC-6 Twin Otter—a time-tested, twin turboprop aircraft that can operate on short runways. Ikhana Group, LLC services and modifies Twin Otters, particularly the older models that were produced in the twentieth century.

Two decades ago, the parties' predecessors entered into a Data License and Royalty Agreement. They struck a deal where the aircraft manufacturer licensed valuable,

- 1 -

confidential data about the Twin Otter for the development of aircraft modifications.  In exchange, the services company agreed to pay a royalty when it sold a modification.  Plus, once the agreement was signed, the servicer received the right to use the Twin Otter trademark to market the modifications.

Much has since changed.  Ikhana and Viking stepped into the shoes of their predecessors, and Viking restarted production of the Twin Otter.  Then, without Viking's cooperation, Ikhana developed a modification for newer Twin Otters.  Ikhana wants to sell this modification without Viking's approval, and the parties find themselves in a logjam.  They bring dueling claims invoking contract, trade secret, and unfair competition law.  Viking now moves for a preliminary injunction, arguing Ikhana is violating the terms of the parties' agreement and misusing Viking's trade secrets.

At oral argument, the Court zeroed in on an injunction that would return the parties to the status quo before litigation.  Under this framing, Viking has the right to collect royalties from Ikhana.  Ikhana has the right to service and sell various modifications for the Twin Otter.  Does Ikhana also, however, have the right to develop and sell a Twin Otter modification in the face of Viking's opposition?

The parties' agreement reveals the answer is no.  Ikhana did not receive a license to use Viking's data to develop any and all aircraft modifications; rather, the scope of the license is limited to those modifications found in an agreed-upon appendix.  The parties contemplated new modifications would be identified and added to their deal, but they agreed to work together to do so.  None of the contract's terms give Ikhana the right to forge ahead alone, especially in the face of opposition from its counterparty.

Therefore, Viking has shown a likelihood of success on its claim that Ikhana is in breach of the licensing agreement, and the other requirements for injunctive relief are met.  A narrow prohibitory injunction is appropriate to return the parties to their positions before litigation, but not unravel their two-decade contractual relationship.  Hence, for the following reasons, the Court grants Viking's Motion for a Preliminary Injunction.

23cv1306

## BACKGROUND

### I.   The Twin Otter

This dispute centers on the Twin Otter—a lightweight, twin turboprop aircraft with short take-off and landing capabilities.  (Barber Decl. ¶¶ 14–15, ECF No. 9-2.)  Depending on its configuration, the Twin Otter can carry up to nineteen passengers, transport cargo, and perform other missions like search and rescue.  (*Id.* ¶¶ 14, 47.)



Twin Otter

De Havilland Canada ("DHC") originally manufactured the Twin Otter between 1965 and 1988.  (Barber Decl. ¶¶ 9–10; Zublin Decl. ¶ 9, ECF No. 28-1.)  DHC produced three variants—the DHC-6 Series 100, Series 200, and Series 300.  (Barber Decl. ¶ 9.)  With production discontinued, these variants of the Twin Otter are known as legacy aircraft—or the Legacy Series.  (*Id.* ¶¶ 9–11; Zublin Decl. ¶ 9.)

By the early 2000s, many Twin Otters were still in service, which created a market for modifying these aircraft and enhancing their operational life.  (*See* Zublin Decl. ¶¶ 12, 14.)  This aftermarket is Ikhana's bread and butter.  (*Id.* ¶ 4.)  To understand this business, however, the Court briefly touches on the regulatory backdrop.

### II.   Design Certifications

The design of the Twin Otter and changes to the aircraft are subject to regulation in the United States and other jurisdictions.  Under the Federal Aviation Act, Congress charged the Federal Aviation Administration with regulating aviation safety.  49 U.S.C. § 40101; *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981, 984 (9th Cir. 2019).  "Accordingly,

the FAA has prescribed a comprehensive set of rules and regulations, including a multi-step certification process, for aircraft design and production." *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1171 (9th Cir. 2002). Judge McKeown aptly summarized two aspects of the certification process that are relevant here—the type certificate and the supplemental type certificate:

> The first stage of this process is type certification, in which airplane manufacturers seek approval of new aircraft designs. Under federal regulations, aircraft manufacturers must analyze and test their new aircraft designs. Based on the resulting engineering and test data, the FAA then determines the airworthiness of those designs. If the manufacturer demonstrates that the design complies with federal regulations, the FAA issues a type certificate. In most instances, the type certificate covers an aircraft model, rather than an individual airplane.

> Any major change to an FAA-approved design then requires additional certification in the form of a supplemental type certificate, also known as an STC. By issuing an STC, the FAA approves a modification to a previously-certified aircraft design. STCs are obtained through the same process as type certificates: the applicant must provide the FAA with sufficient engineering and test data to demonstrate compliance with federal regulations.

*Id.* (citations omitted); *see also Riggs*, 939 F.3d at 984; *Helicopter Transp. Servs., LLC v. Sikorsky Aircraft Corp.*, 448 F. Supp. 3d 1127, 1131 (D. Or. 2020).

## III. Data License and Royalty Agreement

Returning to the early 2000s and the aging Twin Otter fleet, by then Bombardier had acquired DHC—the Twin Otter's original manufacturer. (Barber Decl. ¶ 9.) Meanwhile, Ikhana's predecessor, R.W. Martin, had "developed innovative solutions to enhance the operational life of the [Twin Otter] and certify those solutions with national aviation authorities to obtain Supplemental Type Certificates." (Data License and Royalty Agreement ("DLA") Recitals, Barber Decl. ¶ 36, Ex. C, ECF 9-2 at 28 to 99.) One such solution is the "Twin Otter wing box re-life STC," which involves replacing "fatigue critical components with new components." (DLA App. C.) For this upgrade, the servicer replaces certain wing panels on the aircraft and installs modifications detailed in service

bulletins, such as the "introduction of additional drain holes" and adding "flap hinge arm inspection panels" to the aircraft. (*Id.*)

In August 2003, Bombardier and R.W. Martin entered into a Data License and Royalty Agreement to address modifications to the Twin Otter. (Barber Decl. ¶ 36.) The DLA binds Bombardier's and R.W. Martin's successors, so the Court refers to Ikhana in lieu of R.W. Martin from here on out. (DLA § 10.1; *see also* Zublin Decl. ¶ 7.)

<u>Bargain</u>. After acknowledging Ikhana's aftermarket development efforts, the parties recited that they desired to "work together in developing, promoting, and selling" STCs for the Twin Otter. (DLA Recitals.) To that end, the parties reached a deal where Bombardier licensed detailed, confidential data about the Twin Otter to Ikhana. (*Id.* §§ 1.3, 2.1.) Ikhana agreed this data is "confidential and proprietary to Bombardier" and "will be used by [Ikhana] solely for the purpose set forth in Article I"—that is, "for the development of the STCs, listed in Appendix A." (*Id.* § 1.3.)

Bombardier also agreed to promote, "in close collaboration with [Ikhana]," the STCs identified in Appendix A. (DLA § 1.1.1.) In addition, Bombardier agreed to sell Twin Otter replacement parts to Ikhana at Bombardier's "direct vendor's cost." (*Id.* § 1.4.1.) Ikhana would then sell STC modifications "directly to the customer," with the freedom to "establish its own sale prices." (*Id.* § 1.1.3.) In return for Ikhana securing proprietary data about the Twin Otter, Bombardier's marketing cooperation, and the right to purchase discounted parts, Ikhana agreed to pay a royalty fee "for each STC sold in Appendix A," including the "wing box re-life STC" described above that was already available. (*Id.* § 3.1.)

<u>Appendix A (STCs)</u>. When the DLA was executed, Appendix A identified six additional STCs that were in development for the DHC-6 Series 200 and Series 300, including modifications to increase the aircraft's weight capacity and "re-life" the fuselage. (DLA App. A.) Beyond these modifications, the parties agreed to "continue to work together to identify additional enhancement programs for the Aircraft." (*Id.* § 1.2.2.3.) They agreed that new enhancements "will be defined and an estimated availability to

market date will be established." (*Id.*)  Planned STCs would then "be added to Appendix A" and be "fully incorporated into and governed by" the DLA.  (*Id.*)

<u>Trademarks</u>.  After signing the DLA, Bombardier confirmed Ikhana's use of specific trade names.  (Barber Decl. Ex. D.)  Bombardier granted Ikhana permission to use the "DHC-6" and "Twin Otter" trade names "in the promotion and the selling of [STCs] for DHC-6 as long as the [DLA] is in full force."  (*Id.*)[1]



*An Ikhana-Modified Twin Otter*

## IV.   Performance

The parties worked collaboratively for many years to develop and market STCs for the Twin Otter.  (Barber Decl. ¶ 43; Zublin Dec. ¶ 7.)  During this period, Viking stepped into the shoes of Bombardier when Viking acquired the spare parts and product support

---

[1] Viking asks the Court to take judicial notice of the U.S. Patent and Trademark Office's registration and acceptance of the Twin Otter trademark.  (ECF No. 9-3; *see also* Barber Decl. ¶ 29, Exs. A, B.)  The Court grants the request.  *See* Fed. R. Evid. 201(b); *see also, e.g.*, *Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*, No. C08-04397 WHA, 2008 WL 6742224, at *2 (N.D. Cal. Dec. 18, 2008) (taking judicial notice of similar materials).

business for the Legacy Series in 2005 and then later acquired the type certificates for the aircraft in 2006.  (Barber Decl. ¶¶ 9–10; Zublin Decl. ¶ 10.)

The Series 400.  Viking's plans for the Twin Otter went beyond selling spare parts and supporting the Legacy Series.  In 2007, Viking, at a cost of tens of millions of dollars, started developing a fourth generation Twin Otter with modernized avionics and more powerful engines.  (Barber Decl. ¶ 16.)  In 2010, Viking launched the DHC-6 Series 400, and Viking has since produced more than one hundred and fifty Series 400 aircraft.  (Id. ¶ 20.)

Given its recent production, the Series 400 does not have the same need for "life-extending modifications" as the Legacy Series.  (Barber Decl. ¶ 45.)   In the same vein, Viking argues the purpose of the DLA is to support and upgrade the Legacy Series—not a newer aircraft that did not exist when the DLA was formed.  (Mot. 4:27–5:3; Barber Decl. ¶ 40.)  Viking, therefore, states it "needed to ensure that modifications to the 400 Series Aircraft were, among other things, consistent with the 400 Series Aircraft's branding and in furtherance of the business case for developing it."  (Id. ¶ 45.)  Thus, although the parties explored modifications to the 400 Series, Viking avers that "the parties typically documented their agreements as to modifications for the 400 Series Aircraft in separate contracts or supplements to the DLA that reflected the unique considerations applicable to the 400 Series Aircraft."  (Id. ¶ 46.)

Disputed STC.  Viking further contends that in 2015, consistent with their prior agreements, Viking and Ikhana "engaged in negotiations to develop a modification that would increase to 14,000 pounds the maximum take-off weight ('MTOW') for the 400 Series Aircraft in commuter operations."  (Barber Decl. ¶ 52.)  The parties prepared a draft statement of work dated May 28, 2015, and memorialized their negotiations in a 2015 Discussion Paper.  (Id. ¶ 53; Ex. G.)  Ultimately, however, the parties were unable to reach agreement on the STC concerning increasing the take-off weight of the 400 Series.  (Id. ¶ 54.)

23cv1306

Viking claims Ikhana breached the DLA when Ikhana later restarted development of the modification to the 400 Series without disclosing the effort to Viking. (Barber Decl. ¶ 58.)  The Court will refer to this proposed STC for the 400 Series aircraft that increases the aircraft's maximum take-off weight for commuter operations as the Disputed STC. Viking learned about the Disputed STC when a press release reported the modification "will transform the DHC-6-400 series by combining a significant increase in payload capabilities with the latest . . . avionics systems." (*Id.* ¶ 59, Ex. H.) Viking submits it never granted Ikhana permission to develop the Disputed STC under the DLA, and therefore also never granted Ikhana permission to use any of its trademarks in connection with the modification, let alone provide Viking's proprietary data to a third party to create a newer avionics system. (*Id.* ¶ 60.)

Ikhana, on the other hand, states its development of the Disputed STC is consistent with the parties' history.  Ikhana submits that the parties did not regularly update Appendix A to the DLA to formally add new STCs. (Zublin Decl. ¶ 17.)  Instead, Ikhana would start working on a new STC for the Twin Otter, notify Viking once the STC was issued by the FAA, and then commence paying royalties upon sales of the STC. (*Id.*)  Ikhana also shows that in 2018, Viking conducted an audit of Ikhana's royalty payments—a right afforded to Viking under the DLA. (*Id.* ¶ 22.)  In response to the audit, Ikhana produced a schedule that listed twenty-five STCs that Ikhana owns related to the Twin Otter. (*Id.* ¶ 23, Ex. D.) Ikhana claims Viking identified no discrepancies with the listed STCs or the way in which Ikhana calculated royalties.  Nor did Viking dispute that any of the STCs were covered by the DLA. (*Id.* ¶ 25.)

Classic 300-G.  During this same period, Viking was investing its resources into developing a fifth generation Twin Otter—the Classic 300-G—that has an increased take-off weight capacity "through the use of newer, lighter materials and system components." (Barber Decl. ¶¶ 63–64.)  The Classic 300-G "is, unsurprisingly, initially more expensive to purchase than a modification to an existing aircraft; its list price will be several million dollars." (*Id.* ¶ 67.)  Thus, Viking contends sales of the Disputed STC by Ikhana "are

highly likely to depress sales of the Classic 300-G," despite that Viking believes the Classic 300-G takes an approach to increasing take-off weight that is superior to the Disputed STC. (*Id.* ¶¶ 62, 64–69.)  Moreover, Viking claims it faces irreparable harm to its "reputation and customer goodwill, due to the association of the Viking 400 Series Aircraft in passenger operations with an out-of-date modification that increases operating costs and eliminates one of the features for which the Twin Otter is best known: short take-off and landing capabilities." (*Id.* ¶ 100.)  Viking states it therefore met with Ikhana and issued a notice of default under the DLA based on Ikhana using Viking's proprietary data for the unauthorized STC.  (*Id.* ¶¶ 73–74, Ex. I.)

## V.   Litigation

In July 2023, Ikhana filed this action against Viking. (Compl., ECF No. 1.) Ikhana's operative complaint brings claims for declaratory judgment, breach of the implied covenant of good faith and fair dealing, unfair competition, and violation of the Sherman Act. (First Am. Compl. ¶¶ 59–78, ECF No. 25.)  On August 25, 2023, Viking counterclaimed against Ikhana and its parent company, Aevex Aerospace, LLC.[2]  (Counterclaim, ECF No. 4-1.) Viking alleges Ikhana breached the DLA, misappropriated trade secrets in violation of both the Defend Trade Secrets Act and California's Uniform Trade Secrets Act, and violated federal trademark law.  (*Id.* ¶¶ 95–136.)  The same day, Viking moved for a preliminary injunction.  (Mot., ECF No. 9.)  Ikhana opposes.  (Opp'n, ECF No. 28.)  The Court heard argument on the motion.  (ECF No. 31; *see also* Tr., ECF No. 32.)

## LEGAL STANDARD

A court may issue preliminary injunctive relief "to preserve the status quo between the parties pending a resolution of a case on the merits," *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) (citing *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).  "The Supreme Court has emphasized that preliminary injunctions are an 'extraordinary remedy never awarded as of right.'"

---

[2] For simplicity, the Court refers to the related counter-defendant entities as "Ikhana" throughout this order.

*Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

A movant seeking a preliminary injunction "must satisfy *Winter's* four-factor test." *Garcia*, 786 F.3d at 740 (citing *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012)); *accord Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 944 (9th Cir. 2013).  Under this test, a movant must establish: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) a preliminary injunction is in the public interest.  *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20).

## ANALYSIS

## I.    Type of Injunction

At the threshold, Ikhana argues Viking is seeking a mandatory injunction, instead of a prohibitory injunction.  (Opp'n 9:8–24, n.7; *see also* Tr. 24:16–26:24.)  "A prohibitory injunction prohibits a party from taking action and 'preserve[s] the status quo pending a determination of the action on the merits.'"  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009) (quoting *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988)).  The status quo refers to the last uncontested status that preceded the controversy.  *N.D. ex rel. Parents v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1112 n.6 (9th Cir. 2010).  Put differently, the status quo is the "legally relevant relationship between the parties before the controversy arose."  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) (emphasis omitted).

By comparison, a mandatory injunction "orders a responsible party to 'take action.'" *Garcia*, 786 F.3d at 740 (quoting *Marlyn*, 571 F.3d at 879).  This second type of injunction "goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored."  *Id.* (alteration in original) (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)).  Hence, the standard for a mandatory injunction is "doubly

demanding" and requires showing the law and facts clearly favor the movant's position. *Id.*

Ikhana contends Viking's proposed injunction "would go much further than prohibiting just the STC application currently under consideration by the FAA." (Opp'n 2:15–16.) Indeed, if the Court prevents "Ikhana from using trademarks and data that it has license to use, the injunction would effectively halt Ikhana from marketing any of its STCs, even those it has held and paid royalties on for decades." (*Id.* 2:17–19.)

This concern is well-taken. The relevant relationship that predates this controversy is the parties' DLA. Before this dispute arose, Ikhana had the right to market and sell its existing portfolio of STCs under the DLA. Ikhana likewise had the right to hold and use Viking's data as part of its STC business. In addition, because the DLA remained in effect, Ikhana had the right to use certain trade names to market the existing STCs. Viking, on the other hand, had the right to collect royalty payments from Ikhana. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (explaining "[t]he status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy'" (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 809 (9th Cir. 1963))).

With this framing in mind, the Court stated at oral argument that it was considering an injunction that only stops Ikhana from proceeding with the Disputed STC. (Tr. 3:1–10.) The Court could do so by commanding Ikhana to withdraw its STC application with the FAA. Viking, however, suggested that enjoining Ikhana from marketing and selling the Disputed STC would have the same effect. (*Id.* 4:12–16.) The Court agrees. And this narrow injunction would undoubtedly be prohibitory. If the Court stops Ikhana from marketing and selling the Disputed STC, but does not unwind the parties' twenty-year contract, then Court will be returning the parties to their last uncontested status before this controversy arose. *See Marlyn*, 571 F.3d at 879; *GoTo.com*, 202 F.3d at 1210. Hence, to determine whether this narrow injunction should issue, the Court applies the traditional *Winter* test for a prohibitory injunction below. *See Garcia*, 786 F.3d at 740.

23cv1306

## II.     Success on the Merits

Viking ties its success on the merits to its breach of contract, trade secret misappropriation, trademark infringement, and unfair competition claims.  (Mot. 10:8 21:7.)  Because the breach of contract and trade secret claims pave the way for injunctive relief, the Court limits its discussion to these claims.

### A.     Breach of Contract

The parties agree New York law governs the DLA.  (Mot. 10 n.5; Opp'n 10 n.8; *see also* DLA § 15.1.)  Under New York law, a breach of contract claim has four elements: "the existence of a contract, the plaintiff's performance, the defendant's breach, and damages resulting from the breach."  *LMEG Wireless, LLC v. Farro*, 140 N.Y.S.3d 593, 596 (N.Y. App. Div. 2021).  This dispute centers on the breach element, which requires the Court to interpret the agreement.

The DLA, "like any other agreement," is "subject to basic contract interpretation principles."  *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013).  "'The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent' and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.'"  *Donohue v. Cuomo*, 38 N.Y.3d 1, 12 (2022) (quoting *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002)).  "As such, 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'"  *Schron*, 20 N.Y.3d at 436 (quoting *Greenfield*, 98 N.Y.2d at 569).  "Whether a contractual term is ambiguous must be determined by looking within the four corners of the document and not to extrinsic sources."  *Triple Diamond Cafe, Inc. v. Those Certain Underwriters at Lloyd's London*, 124 A.D.3d 763, 765 (N.Y. App. Div. 2015).

Moreover, merger clauses under New York Law "are not mere boilerplate."  *Torres v. D'Alesso*, 80 A.D.3d 46, 53 (N.Y. App. Div. 2010) (emphasis omitted).  A merger clause establishes the parties' intent that the contract "is to be considered a completely integrated writing," which "precludes extrinsic proof to add to or vary its terms."  *Primex Int'l Corp.*

*v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 600 (1997); *see also Schron v. Grunstein*, 32 Misc. 3d 231, 236 (N.Y. Sup. Ct. 2011) ("For this reason, courts dealing with agreements containing merger clauses rarely admit extrinsic evidence to vary their terms.").

Viking argues Ikhana breached the DLA by developing the Disputed STC because "Ikhana never sought Viking's consent and Viking never gave it." (Mot. 11:5–6.) This interpretation finds support in the plain meaning of the DLA's terms. As mentioned, the DLA grants Ikhana a license to use Viking's confidential aircraft data in certain circumstances:

> [Viking] agrees to grant the right to [Ikhana] (hereinafter referred as "License"), on a[n] exclusive and non-transferable basis and in accordance with the terms and conditions set forth herein, to . . . use, copy and create derivatives of the Aircraft Data (as later defined in Article 2) for the development of the STCs, listed in Appendix A, and to ensure initial and continuing conformity with the FAA, TC and other CAA. The Data shall be used by [Ikhana] solely in connection with the purposes of this Agreement.

(DLA § 1.3.)

As seen, the scope of the license granted to Ikhana is not open ended; it is circumscribed to using the data to develop those STCs "listed in Appendix A." (*Id.*; *see also id.* § 4.1 (providing Ikhana agrees the data will be used "solely for the purpose set forth in Article I" and "will not be disclosed or transferred to any third party, except to [aviation regulators,] without [Viking's] prior written consent"). The parties identify several STCs on Appendix A, but the Disputed STC is not one of them. (*See id.* App. A.) And although the parties contemplated new STCs would be developed and subject to the DLA's terms, they agreed to jointly do so:

> The Parties shall continue to work together to identify additional enhancement programs for the Aircraft. Each program will be defined and an estimated availability to market date will be established. This information will be added to Appendix A, and will be fully incorporated into and governed by this Agreement.

(*Id.* § 1.2.2.3.)

These terms are consistent with the parties' recitals, which expressed their "desire to work together in developing, promoting and selling Aircraft specific [STCs]." (DLA 1.) *See Anonymous v. Anonymous*, 198 A.D.3d 526, 526 (N.Y. App. Div. 2021); *see also Est. of Hatch by Ruzow v. Nyco Mins. Inc.*, 245 A.D.2d 746, 748 (N.Y. App. Div. 1997) (noting "while a recital is not strictly part of a contract, it may have a material bearing on the construction of the contract" (citing *Frenchman & Sweet, Inc. v. Philco Disc. Corp.*, 21 A.D.2d 180, 182 (N.Y. App. Div. 1964))).   The parties also agreed the DLA "constitutes the entire and only agreement between the Parties relating to the subject matter hereof, and all prior negotiations, representations, agreements and understandings are superseded hereby." (*Id.* § 19.1.)  Finally, they confirmed the DLA "shall not be amended or modified except in writing signed by the authorized representatives of the parties hereto." (*Id.* § 18.4.)  "No course of dealing or usage of trade by or between the parties shall be deemed to effect any such amendment or modification." (*Id.*)

When these terms are read together, the Court draws two conclusions.  First, the DLA's merger clause establishes the contract is fully integrated.  *Cornhusker Farms, Inc. v. Hunts Point Co-op. Mkt., Inc.*, 2 A.D.3d 201, 203 (N.Y. App. Div. 2003).  Second, the plain meaning of the DLA's terms supports Viking's interpretation that Ikhana's license does not include the right to develop any STC, especially one that is opposed by its counterparty, Viking.  To conclude otherwise would require the Court to ignore three parts of the agreement: (1) the limiting language in the license grant, (2) the clause providing the parties will "work together" to identify new STCs, and (3) the requirement that new STCs be identified in Appendix A with a description and market availability date.  (*See* DLA §§ 1.2.2.3, 1.3.)  *See Corhill Corp. v. S. D. Plants, Inc.*, 9 N.Y.2d 595, 599 (1961) ("It is a cardinal rule of construction that a court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract without force and effect.'").

Therefore, if this interpretation prevails, Viking has shown a likelihood of success on its claim that Ikhana is in breach of the DLA by developing and marketing the Disputed STC.  The Court turns to Ikhana's three counterarguments.

- 14 -

Lack of Consent Provision.  At oral argument, Ikhana argued Viking's interpretation should not control because there is no express consent provision in the DLA that gives Viking the right to approve new STCs.  (Tr. 19:14–20:9; 31:7–31:19.)  The Court is unpersuaded for two reasons.  First, this argument is not developed in Ikhana's opposition. The brief does not mention the word consent.  Rather, the opposition argues the course of performance shows the DLA should be interpreted in Ikhana's favor.  (Opp'n 10:6–13:28.) Second, as mentioned, the scope of Ikhana's license is limited.  Had the DLA granted Ikhana a license to develop and sell any STCs—not just those ones listed in an agreed-upon appendix—then the lack of an express consent provision would be compelling.  The Court, though, is presented with a fully integrated writing that provides for a license limited in scope and states that the parties will work together to identify new STCs and list them in an attached appendix.  Consequently, Ikhana's first counterargument is unpersuasive. *See Donohue*, 38 N.Y.3d at 12 (explaining that what the contracting parties say in their writing is the "best evidence" of what they intend).

Course of Performance – Ambiguity.   Ikhana argues the parties' course of performance shows they did not enforce the requirement that new STCs be listed on Appendix A. (Opp'n 10:6–13:8.)  There are two ways this course of performance evidence could be used under New York law.  First, where a writing is ambiguous, course of performance can be used to resolve the ambiguity.  *E.g.*, *Alternatives Fed. Credit Union v. Olbios, LLC*, 14 A.D.3d 779, 781 (N.Y. App. Div. 2005).   "Only when a contract is ambiguous can the interpretation placed upon it by the parties, as shown by their conduct, be considered in determining their intent, and even then, the parties' practices are 'merely an interpretive tool and cannot be used to create a contractual right independent of some express source in the underlying agreement.'"  *Adamo v. City of Albany*, 156 A.D.3d 1017, 1018 (N.Y. App. Div. 2017) (alteration omitted) (quoting *Karol v. Polsinello*, 127 A.D.3d 1401, 1404 (N.Y. App. Div. 2015)).

Ikhana's course of performance argument is unpersuasive because it short-circuits the analysis under New York law.  Although Ikhana argues the parties' course of conduct

unambiguously supports its interpretation of the DLA, Ikhana does not identify which portion of the contract is ambiguous.  (*See* Opp'n 10:7–11:4.)  The Court need go no further.  "[O]nly where an ambiguity is present in a contract may the subsequent conduct of the parties be used to indicate their intent."  *Est. of Hatch by Ruzow v. Nyco Mins. Inc.*, 245 A.D.2d 746, 749 (N.Y. App. Div. 1997).  Indeed, the first case Ikhana relies on for its course of performance argument applies this same rule.  *See Fed. Ins. Co. v. Ams. Ins. Co.*, 258 A.D. 2d 39, 44 (N.Y. App. Div. 1999) (noting "[w]here, as here, there are internal inconsistencies in a contract pointing to ambiguity, extrinsic evidence is admissible to determine the parties' intent").  (*See also* Opp'n 10:12–15 (relying on *Fed. Ins. Co.*).)  Hence, because Ikhana does not point the Court to an ambiguity, the Court will not consider course of performance to interpret the fully integrated DLA.

<u>Course of Performance – Modification</u>.  Ikhana also argues the parties modified the DLA through their course of performance, which is distinguishable from the interpretation argument resolved above.  (Opp'n 12:20–13:8.)  "[A]ny written agreement, even one which provides that it cannot be modified except by a writing signed by the parties, can be effectively modified by a course of actual performance."  *Rosen Tr. v. Rosen*, 53 A.D.2d 342, 352 (N.Y. App. Div. 1976) (citing *All-Year Golf, Inc. v. Prod. Invs. Corp.*, 34 A.D.2d 246 (N.Y. App. Div. 1970)).  That said, parties may limit the effect of conduct that is inconsistent with the writing's terms by including a no-waiver provision.  *E.g.*, *Whitecap (U.S.) Fund I, LP v. Siemens First Cap. Com. Fin. LLC*, 121 A.D.3d 584, 593 (N.Y. App. Div. 2014) (relying on no-waiver clause); *BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*, 112 A.D.3d 509, 511 (N.Y. App. Div. 2013) (same); *Town of Hempstead v. Inc. Vill. of Freeport*, 15 A.D.3d 567, 569 (N.Y. App. Div. 2005) (same).

The DLA contains such a no-waiver provision.  Section 18.2 provides: "Failure at any time [by] a Party to enforce any provision of this Agreement shall neither constitute a waiver of such provision nor prejudice its right to enforce such provision at any subsequent time." (DLA § 18.2.)  Meaning, even if Viking repeatedly failed to enforce the requirement that new STCs be listed in Appendix A through the parties' cooperation, Ikhana agreed

that this failure does not prevent Viking from enforcing the requirement now. Consequently, Ikhana's reliance on course of performance evidence faces an uphill battle. *See, e.g.*, *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 137 (S.D.N.Y. 2016) (refusing to "wade into [a] factual dispute" concerning conduct under an agreement because the agreement contained a no-waiver clause, and such clauses are enforceable under New York law).

Further, although a no-waiver clause itself may be waived, "such a waiver 'will not be lightly presumed.'" *Todd Eng. Enters. LLC v. Hudson Home Grp., LLC*, 206 A.D.3d 585, 587 (N.Y. App. Div. 2022) (quoting *Parlux Fragrances, LLC v. S. Carter Enters., LLC*, 204 A.D.3d 72, 87 (N.Y. App. Div. 2022)); *cf. Shionogi Inc. v. Andrx Labs, LLC*, 187 A.D.3d 422 (N.Y. App. Div. 2020) (reasoning in a licensing dispute that even if course of performance evidence could be considered, the party could not overcome one of the agreement's other clauses). Regardless, Ikhana does not address the no-waiver clause. And on this record, the Court is unconvinced that any course of performance prevents Viking from enforcing the DLA's terms, including the contract's no-waiver clause.

In sum, the DLA's terms support Viking's interpretation, and Ikhana likely is in breach of the contract under this interpretation. Ikhana neither identifies an ambiguity in the DLA nor shows that course of performance evidence should trump the integrated DLA's terms. The Court therefore finds Viking has shown a likelihood of success on its breach of contract claim.

## B. Trade Secret Misappropriation

Viking brings claims for violation of the Defend Trade Secrets Act ("DTSA") and California's Uniform Trade Secrets Act. The Court need only address the DTSA here. "To succeed on a claim for misappropriation of trade secrets under the DTSA, a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020) (citing 18 U.S.C. § 1839(5)).

The DTSA defines a trade secret to include "scientific, technical, . . . or engineering information, including patterns, plans, . . . [and] designs."  18 U.S.C. § 1839(3).  The information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* Hence, "the definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *InteliClear*, 978 F.3d at 657.

Viking argues Ikhana is misappropriating its valuable information—the confidential aircraft data—by using the data outside the scope permitted by the DLA.  (Mot. 21:10–24.) Viking contends Ikhana is welcome to develop its "own technologies and compete" against Viking, but what Ikhana cannot do is "take [Viking's] trade secrets" and then use them against Viking despite the limitations in the parties' contract that allowed Ikhana to possess the data.  (Tr. 14:11–15.)

As mentioned above, Viking licensed a trove of confidential data about the Twin Otter to Ikhana.  (DLA § 1.3.1, 2.1.)  Ikhana agreed to use this data "solely in the connection with the purposes of [the DLA]."  (*Id.* § 1.3.1.)  Appendix E to the DLA identifies the data by listing numerous schematics—assembly drawings—for the Twin Otter, including for the aircraft's wings and certain internal structures.  (*Id.* App. E.)  Viking attests to the economic value of this data and the company's efforts to keep it secret.  (Barber Decl. ¶¶ 21–27.)  "[I]t is well settled that detailed manufacturing drawings and tolerance data are prima facie trade secrets."  *A. H. Emery Co. v. Marcan Prod. Corp.*, 389 F.2d 11, 16 (2d Cir. 1968); *see also, e.g.*, *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1176, 1184 (W.D. Wash. 2019) (finding trade secret claim plausible where former employee misappropriated aircraft manufacturer's information concerning design and certification of aircraft); *John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1296–1302 (D. Utah 2020) (finding schematics manual for air conditioning equipment in military aircraft met definition of trade secret under the DTSA and state

- 18 -

uniform act).  Viking thus shows its confidential aircraft data is entitled to trade secret protection.  In addition, for the reasons described above, Viking demonstrates Ikhana lacks the contractual right to use the data in connection with the Disputed STC.  Therefore, Viking shows a likelihood of success on its DTSA claim.

Ikhana advances two counterattacks.  First, Ikhana argues there is no trade secret liability because Ikhana is not in breach of the DLA.  (Opp'n 14:7–23.)  This argument, however, is dispelled by the Court's analysis on the contract claim above.

Second, Ikhana argues Viking does not adequately define its trade secrets.  (Opp'n 14:24–16:24.)  Ikhana contends Viking's descriptions of its trade secrets are "too broad and vague for purposes of establishing the first element of a trade secret claim."  (*Id.* 15:8–16:24.)  The trade secret proponent generally must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies."  *E.g.*, *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 881 (N.D. Cal. 2018).  Viking, however, satisfies this standard.  The DLA includes an appendix that identifies the Twin Otter schematics at issue, and Viking's declarant also describes the aircraft data it seeks to protect.  (DLA App. E; *see also* Barber Decl. ¶ 22.)

Further, the Court finds persuasive Judge Koh's decision in *Alta Devices*, *Inc. v. LG Electronics, Inc.*, 343 F. Supp. 3d at 881.  There, Judge Koh rejected LG's argument that Alta failed to identify its trade secrets with sufficient particularity where the secrets were provided to LG under a non-disclosure agreement.  *Id.* at 880–84.  Judge Koh reasoned that "because Alta's claims are based on the Confidential Information exchanged pursuant to the 2011 NDA, [LG] can hardly claim it is unable to determine what trade secrets Alta gave [LG] in 2011 and 2012."  *Id.* at 881 (quotation marks omitted).  Similarly, here, Ikhana is a party to the contract that led to the exchange of the trade secret information.  Although Ikhana succeeded its predecessor, Ikhana's president and declarant has "held a senior leadership position with Ikhana or its predecessor, R.W. Martin, Inc., since 1987."  (Zublin

Decl. ¶ 1.)  Ikhana "can hardly claim it is unable to determine what trade secrets" are at issue.  *See Alta Devices*, 343 F. Supp. 3d at 881.  Ikhana's second argument therefore does not withstand scrutiny.

Simply put, Viking shows a likelihood of success on its claim under the DTSA based on Ikhana using its proprietary aircraft data outside the scope of the DLA.

## III.   Irreparable Harm

To obtain preliminary relief, Viking must demonstrate that irreparable harm is likely in the absence of an injunction.  *Winter*, 555 U.S. at 20, 22–23.  "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages."  *Brewer*, 757 F.3d at 1068 (citing *Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)).  Moreover, "[a] preliminary injunction may only be granted when the moving party has demonstrated a significant threat of irreparable injury, irrespective of the magnitude of the injury."  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999).

Viking identifies four grounds for irreparable harm.  (Mot. 22:10–24.)  The Court addresses two of them here.  First, Viking contends it will suffer irreparable harm because Ikhana wrongly used its trade secrets to develop the Disputed STC and plans to continue to take advantage of Viking's information by selling the STC.  (*Id.* 22:10–23.)  Second, Viking argues it will lose prospective sales of its aircraft and suffer harm to its reputation and goodwill.  (*Id.* 22:15–24; *see also* Barber Decl. ¶¶ 98–100.)

If misappropriated trade secrets are being used for commercial advantage, then this showing supports a finding of irreparable harm.  *E.g.*, *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1209 (E.D. Cal. 2020); *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017); *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. C 10-3428 PSG, 2013 WL 890126, at *9 (N.D. Cal. Jan. 23, 2013).  Further, "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001); *see*

*also, e.g.*, *Synopsys, Inc. v. InnoGrit, Corp.*, No. 19-CV-02082-LHK, 2019 WL 2617091, at *4 (N.D. Cal. June 26, 2019) (reasoning "[a]mple case law supports" the argument "that loss of market share and lost profits" can support a finding of irreparable harm").  Finally, the Court notes some decisions presume a finding of irreparable harm in the trade secret context, but other decisions question the legitimacy of this presumption.  *E.g.*, *Comet Techs. United States of Am. Inc. v. Beuerman*, No. 18-CV-01441-LHK, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018) (collecting cases); *but see Cutera*, 444 F. Supp. 3d at 1208 (noting other district courts have declined to rely on this presumption in light of more recent Ninth Circuit cases).

The Court finds Viking meets its burden of demonstrating a likelihood of irreparable harm.  Viking shows Ikhana is using its trade secrets for commercial advantage—the Disputed STC—and intends to continue using them, likely causing Viking harm.  This showing is enough to support the limited injunction contemplated by the Court.  *See, e.g.*, *Cutera, Inc.*, 444 F. Supp. 3d at 1209; *Digital Alpha Advisors, LLC v. Ladak*, No. 2:23-CV-01339-JAD-DJA, 2023 WL 6521029, at *3 (D. Nev. Sept. 15, 2023).  The Court is also unpersuaded an award of money damages will be sufficient in these circumstances.  *See Stuhlbarg*, 240 F.3d at 841; *see also Cutera, Inc.*, 444 F. Supp. 3d at 1209.

The Court reaches this conclusion notwithstanding Ikhana's argument that the parties' history of calculating royalty amounts demonstrates any harm can be addressed by damages.  (Opp'n 20:9–21:2.)  This argument is inconsistent with the agreement that binds Ikhana.  Ikhana agreed that a breach of the DLA shall cause "irreparable harm to [Viking]," and Viking's "right to an injunction is necessary because any other remedy may be insufficient to fully compensate [Viking]."  (DLA § 4.5.)

The law supports using Ikhana's concession to bolster the conclusion that irreparable harm is likely.  *See, e.g.*, *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) (applying New York law and reasoning that where a contract conceded that a breach would cause irreparable harm, this concession could arguably be viewed as an admission by the breaching party "that plaintiff will suffer irreparable harm were he to breach the contract's

[relevant] provision"); *accord Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 332 (E.D.N.Y. 2020) ("Although not dispositive, Pennisi's acknowledgement in the Employment Agreement that a violation of the non-competition and non-solicitation restrictions would cause plaintiff irreparable harm entitling it to injunctive relief, further supports a finding of irreparable harm."); *Roswell Cap. Partners LLC v. Alternative Const. Techs.*, No. 08 CIV 10647(DLC), 2009 WL 222348, at *17 (S.D.N.Y. Jan. 30, 2009) (concluding provisions in agreements governed by New York law specifying that "a default constitutes irreparable harm" supported a finding of irreparable harm). Consequently, even though this provision is not dispositive, it supports a finding of irreparable harm when considered in combination with Viking's showing above.

Ikhana's stronger point is that Viking's delay in seeking injunctive relief undermines the claim of irreparable harm. (Opp'n 18:4–20:2.) Courts, including this one, have relied on a party's delay to deny injunctive relief. *See, e.g.*, *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Hueso v. Select Portfolio Servicing, Inc.*, No. 18-CV-1892-BAS-WVG, 2019 WL 3459013, at *2, 5 (S.D. Cal. July 31, 2019) (finding delay "counsels against a finding that the requested relief is warranted"). "Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction, the rationale being that absent a good explanation, a [movant] would promptly have sought an injunction if it were being irreparably harmed." *Open Text, S.A. v. Box, Inc.*, 36 F. Supp. 3d 885, 909 (N.D. Cal. 2014).

Viking first became aware of the Disputed STC around October 2022. (Barber Decl. ¶ 59, Ex. H.) Viking moved for injunctive relief on the same day it filed its Answer and Counterclaim—August 25, 2023. (ECF Nos. 4, 9.) Therefore, the delay is about ten months. Unless there is "a good explanation," this magnitude of delay supports denying injunctive relief. *See Open Text*, 36 F. Supp. 3d at 909; *see also Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993) ("[T]hat [the moving party] tarried

so long before seeking this injunction is . . . relevant in determining whether relief is truly necessary.").

Viking replies that its delay was reasonable because Viking was diligently pursuing a resolution with Ikhana between December 2022 and July 2023. (Reply 8:12–8:28; *see also* Tr. 16:3–17:15.) "A reasonable delay before filing suit, or between filing suit and moving for [a] preliminary injunction, may be excused if a [movant] can demonstrate it has attempted to protect its rights through out-of-court protests or negotiations." *CrossFit, Inc. v. Nielsen*, No. 3:12-cv-325 AJB (WVG), 2012 WL 12872471, at *4 (S.D. Cal. Sept. 12, 2012); *see also HM Elecs., Inc. v. R.F. Techs., Inc.*, No. 12-CV-2884-MMA (WMC), 2013 WL 12074966, at *8 (S.D. Cal. Oct. 3, 2013) (granting preliminary injunction motion filed eight months after complaint where the plaintiff had sought a negotiated resolution); *Guess?, Inc. v. Tres Hermanos*, 993 F. Supp. 1277, 1286 (C.D. Cal. 1997) ("The nine month delay from the cease-and-desist letter to the filing of suit is a reasonable time for Plaintiff to have allowed Defendants to respond to its request and pursue settlement avenues.").

There is no dispute that Viking repeatedly attempted informal resolution during the period of delay. (*See* Zublin Decl. ¶¶ 32–36; *see also* Barber Decl. ¶¶ 71–92.) Ikhana casts doubt on the sincerity and reasonableness of Viking's overtures, but this outcome is to be expected. The only time this set of circumstances will reach a court is when the efforts to resolve the matter informally were unsuccessful. Given the nature of the parties' dispute, the timeline of the anticipated irreparable harm, and Viking's out-of-court efforts to resolve the matter, the Court is satisfied that the delay here does not justify denying injunctive relief. *See Open Text*, 36 F. Supp. 3d at 909; *HM Elecs.*, 2013 WL 12074966, at *8.

In short, Viking meets its burden to demonstrate that irreparable harm is likely in the absence of an injunction.

## IV.   Balance of Equities

To qualify for injunctive relief, Viking must show the balance of the equities tips in its favor. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009). In assessing

23cv1306

whether Viking meets its burden, "the court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" *Id.* (quoting *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)).  Viking argues the equities tip in its favor because Ikhana is unlawfully exploiting its trade secrets and prohibiting Ikhana from wrongly using Viking's data would not cause Ikhana any hardship. (Mot. 23:1–24:7.)  Further, although Ikhana contends an injunction would be devastating to its business (Opp'n 23:9–25), the Court ameliorated this concern by narrowing the scope of the proposed injunction.  A narrow injunction will not pulverize Ikhana's existing business; rather, the Court only contemplates prohibiting Ikhana from marketing and selling the Disputed STC.  Hence, the Court finds the balance of the equities tips in Viking's favor, satisfying the third requirement for injunctive relief.

## V.   Public Interest

Finally, the Court agrees with Viking that an injunction would be in the public interest.  "Courts often find that the public has a strong interest in protecting intellectual property rights." *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 854 (N.D. Cal. 2019) (citing cases).  Further, the public interest is served when a defendant "is asked to do no more than abide by trade laws and the obligations of contractual agreements." *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016); *accord OmniGen Rsch., LLC v. Yongqiang Wang*, No. 6:16-CV-268-MC, 2017 WL 5505041, at *22 (D. Or. Nov. 16, 2017) ("There is 'a public interest in upholding the law and contracts, and having parties abide by their legal duties.'" (quoting *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1229 (D. Or. 2016)).  Ikhana's opposition invokes concerns over aviation safety (Opp'n 21:15–23:8), but a narrow injunction would not disturb Ikhana's existing STCs that support the Legacy Series.  The Court finds this final requirement is met, making an injunction appropriate under the *Winter* test.

## VI.   Bond

Under Rule 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and

- 24 -

23cv1306

damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). "Despite the seemingly mandatory language," this rule grants the court discretion to determine "the amount of security required, *if any.*" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)); *see also Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) ("The district court is afforded wide discretion in setting the amount of the bond.").

Because "the purpose of . . . a bond is to cover any costs or damages suffered by the [party sought to be enjoined] arising from a wrongful injunction," *see Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000), "the party affected by the injunction [bears the] obligation of presenting evidence that a bond is needed," *see Conn. Gen*, 321 F.3d at 883. *Accord Gorbach*, 219 F.3d at 1092 (affirming district court's decision not to require bond where the party sought to be enjoined "did not show that there would be any" damages); *see also Extreme Reach, Inc. v. Spotgenie Partners, LLC*, No. CV 13-07563-DMG (JCGx), 2013 WL 12081182, at *9 (C.D. Cal. Nov. 22, 2013) ("The burden of establishing the amount of bond necessary to secure against the wrongful issuance of an injunction rests with the [non-movant].").

At oral argument, the Court expressed that a bond would be appropriate and inquired as to the proper amount. (Tr. 5:2–14, 33:12–34:5.)  Ikhana requested a substantial bond, but it was unable to provide specifics that would support its substantial request. (*Id.* 34:1–5.)  Having also considering the parties' briefing on this issue, the Court finds it is appropriate to set the bond amount at zero without prejudice. *See Extreme Reach, Inc.*, 2013 WL 12081182, at *9.  If Ikhana believes a bond is still appropriate considering the Court's narrow injunction below, Ikhana may submit an *ex parte* application with evidentiary support addressing this issue.  After reviewing Ikhana's submission and any response by Viking, the Court will revisit the amount of bond under Rule 65(c).

23cv1306

**CONCLUSION & ORDER**

In light of the foregoing, the Court **GRANTS** Counter-Claimant Viking Air, Limited's Motion for a Preliminary Injunction. (ECF No. 9.)

Accordingly, until entry of final judgment in this action, the Court **ENJOINS** Counter-Defendants Ikhana Group, LLC and Aevex Aerospace, LLC, together with their agents, employees, representatives, and all persons and entities in concert or participation with them from offering, marketing, or selling any modification that increases the maximum take-off weight of Viking's 400 Series Twin Otter Aircraft ("DHC-6-400") in commuter operations.

This injunction does not require Ikhana to withdraw its application from the Federal Aviation Administration to amend Supplemental Type Certificate SA02682LA, and this order does not enjoin Ikhana from marketing, offering, or selling its existing Supplemental Type Certificates for the Twin Otter.

**IT IS SO ORDERED.**

**DATED: November 7, 2023**

Hon. Cynthia Bashant
United States District Judge

23cv1306